## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| KIMBERLY MINTZ, as<br>Personal Representative of the Estate of<br>PEARLIE WILLIAMS,<br><br>*Plaintiff*,<br><br>   v.<br><br>BASF CORPORATION, PPG INDUSTRIES,<br>INC., DAVID L. VAN LEWEN, and MAC<br>PENMAN,<br><br>*Defendants,*<br><br>VANTAGE SPECIALTY CHEMICALS,<br>INC.,<br><br>*Nominal Defendant,*<br><br>  and<br><br>ABBOTT LABORATORIES and ABBVIE,<br>INC.,<br><br>*Respondents in Discovery.* | Civil Action No. 24-cv-11591 |

### NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendant PPG Industries, Inc. ("PPG")
files this notice of removal based on diversity jurisdiction and makes the following statement of
the grounds for removal.

### SUMMARY OF THE NOTICE

Plaintiff is a citizen of the State of Georgia and none of the defendants are Georgia citizens.
Complete diversity therefore exists. Since the amount in controversy exceeds $75,000.00, diversity
jurisdiction exists. In addition, there are no properly joined and served Illinois defendants, so
removal is not precluded under the forum-defendant rule.

Further, this case is timely removed. It was filed only on November 4, 2024, and PPG has not yet been served.

## PROCEDURAL HISTORY

1.      On November 4, 2024, Plaintiff filed a Complaint and Demand for Jury Trial (the "Complaint"), styled *Kimberly Mintz, as Personal Representative of the Estate of Pearlie Williams v. PPG Industries, Inc., et al.*, No. 2024L012458, in the Circuit Court of Cook County, Illinois, County Department, Law Division (the "State Action").

2.      Plaintiff has asserted causes of action for negligence, willful and wanton conduct, and public nuisance. Plaintiff is seeking monetary damages.

## THIS CASE IS PROPERLY REMOVED TO THIS COURT

I.      **This Court has diversity jurisdiction.**

        A.      **Complete diversity of citizenship exists.**

3.      Under 28 U.S.C. § 1332(a)(1), this is a civil action between "citizens of different states."

4.      Plaintiff is alleged to be an individual who is residing in and is a citizen of Georgia.

        1.      **Defendants whose citizenship counts for diversity purposes.**

5.      PPG is a Pennsylvania corporation with its principal place of business in Pennsylvania. PPG is not a citizen of the state where the action is brought. *See* 28 U.S.C. §§ 1332(a), 1441(b).

6.      BASF Corporation ("BASF") is a Delaware corporation with its principal place of business in New Jersey. BASF is not a citizen of the state where the action is brought. *See* 28 U.S.C. §§ 1332(a), 1441(b).

2. **Nominal defendants whose citizenship does not count for diversity purposes.**

7. Vantage is a nominal defendant because it reached a binding, global settlement with Plaintiff in the State Action. As stated by the state court during a July 17, 2024, conference:

> are -- there have been, but this Court certainly considers Vantage and Medline to be nominal defendants only and named only. They're solely here for purposes of the settlements.

8. "[S]ettled defendants" are "merely nominal parties," and therefore their presence "is disregarded for removal purposes." *Pulse Eng'g, Inc. v. Fed. Ins. Co.*, No. 06-1237, 2006 WL 6557899, at *3 (S.D. Ind. Dec. 5, 2006).

9. On June 25, 2024, Plaintiffs in the State Action filed a Motion to Vacate Trial Date that for the first time disclosed that "Plaintiffs' counsel and Vantage Specialty Chemicals, Inc. ('Vantage') have just recently reached a landmark settlement that stands to resolve the hundreds of claims alleged against Vantage." Vantage is therefore a settled defendant and a nominal party whose presence is disregarded for removal purposes.[1]

3. **Fraudulently joined defendants whose citizenship does not count for diversity purposes.**

10. While "a plaintiff may choose her own forum, she may not join a nondiverse defendant simply to destroy diversity jurisdiction if she has no legitimate claims against that

---

[1] Upon information and belief, Vantage is a Delaware corporation with a principal place of business in Illinois.

defendant." *Hoidas v. Wal-Mart Stores, Inc.*, No. 09-7409, 2010 WL 1790864, at *1 (N.D. Ill. Apr. 30, 2010) (Hibbler, J.) (internals omitted).

11.     "The fraudulent joinder doctrine therefore allows a district court considering removal to temporarily assume jurisdiction over a case to determine whether a defendant has been fraudulently joined and dismiss him if he is so joined to retain jurisdiction permanently." *Id.* (internals omitted).

12.     Where a plaintiff does not allege the factual basis for any breach of a duty owed by a defendant-employee who is sued by virtue of being an employee of a co-defendant entity, that defendant-employee is fraudulently joined. *E.g.*, *id.* (holding that non-diverse defendant-employee was fraudulently joined because there were no factual allegations to support an inference that he breached a duty owed to plaintiff).

13.     Mac Penman is named as a defendant because he is alleged to have been an Operations Manager for PPG at the Gurnee facility. The Complaint, however, contains no allegations as to what he allegedly did wrong or how any of his actions led to Plaintiff's alleged injuries. Therefore, Mr. Penman is a fraudulently joined defendant whose citizenship does not count for diversity purposes.[2]

14.     David L. Van Lewen is named as a defendant because he is alleged to have been an Ecology and Safety Manager for BASF at the Gurnee facility. The Complaint, however, contains no allegations as to what he allegedly did wrong or how any of his actions led to Plaintiff's alleged injuries. Therefore, Mr. Van Lewen is a fraudulently joined defendant whose citizenship does not count for diversity purposes.[3]

---

[2] Mr. Penman is a citizen of Illinois.

[3] Upon information and belief, Mr. Van Lewen is a citizen of Illinois.

**4.** **"Respondents in discovery" whose citizenship does not count for diversity purposes.**

15.     Plaintiff named Abbott Laboratories ("Abbott") and AbbVie, Inc. ("AbbVie") in the case caption as "respondents in discovery." "Respondents in discovery" are not considered defendants for removal purposes. *Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1485 n.3 (7th Cir. 1996) ("Dr. Anderson was not a party in the lawsuit, but merely a respondent-in-discovery. Thus his citizenship for purposes of diversity was irrelevant."); *Bond v. Wright Med. Tech, Inc.*, No. 12-cv-597, 2012 WL 2413051, at *3 (S.D. Ill. June 26, 2012).

\*     \*     \*

16.     Therefore, at the time of removal, there is complete diversity between Plaintiff and all defendants because no defendants are Georgia citizens. 28 U.S.C. § 1332(a)(1).

17.     Likewise, 28 U.S.C. § 1441(b)(2) does not preclude removal because none of the properly joined and served defendants are citizens of the forum state.[4]

**B.** **The amount in controversy exceeds $75,000.00.**

18.     The amount in controversy in this matter exceeds $75,000.00.

19.     For each of her asserted claims, Plaintiff seeks to recover an amount in excess of the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois, which is $30,000. Accordingly, Plaintiff seeks a minimum of $90,000.00 and removal is proper. *See* 28 U.S.C. § 1332(a).

20.     The amount in controversy for Plaintiff's claims can be aggregated under applicable state law because she may seek to hold defendants jointly and severally liable for their alleged

---

[4] The docket in the State Action does not reflect service upon Vantage, Mr. Penman, or Mr. Van Lewen. Therefore, upon information and belief, none of the named (even if improperly named) Illinois defendants had been served at the time of removal.

conduct. *See* 735 ILCS 5/2-1117; 735 ILCS 5/2-1118; *accord Am. Standard Ins. Co. v. Rogers*, 123 F. Supp. 2d 461, 466 (S.D. Ind. 2000).

**II.      PPG timely filed this notice of removal.**

21.      Plaintiff has yet to serve PPG in the State Action. Therefore, under 28 U.S.C. § 1446(b)(1), this Notice of Removal is being filed within 30 days after PPG was served in the State Action and is timely filed.

**III.      This Court is the appropriate venue for removal.**

22.      Removal is proper to this District and this division because the Eastern Division of the Northern District of Illinois is the district and division within which the State Action is pending. 28 U.S.C. § 1441(a).

**IV.      All properly joined and served remaining defendants consent to removal.**

23.      PPG files this notice of removal.

24.      BASF has not been served in this action such that its consent is not required. *See* 28 U.S.C. § 1446(b)(2)(A) (requiring that only defendants properly joined *and* served must consent to removal (emphasis added)).

25.      Since it is a nominal, settled defendant, Vantage's consent to removal is not required. *Estate of Pilsnik v. Hudler*, 118 F. Supp. 2d 905, 908 (E.D. Wisc. 2000) ("Even if Mr. Hurdler is seen as a defendant, he is only a nominal defendant whose consent is not required for removal."). In addition, as of the date that this notice if filed, Vantage upon information and belief has not been served such that its consent to removal is not required. *See* 28 U.S.C. § 1446(b)(2)(A) (requiring that only defendants properly joined *and* served must consent to removal (emphasis added)).

26. Since they are fraudulently joined, Mr. Penman and Mr. Van Lewan's consent to removal is not required. *See Bahalim v. Ferring Pharm., Inc.*, No. 16-8335, 2017 WL 118418, at *5 (N.D. Ill. Jan. 12, 2017) (consent to removal is not required from defendants who have been fraudulently joined). In addition, as of the date that this notice is filed, Mr. Penman, and Mr. Van Lewan upon information and belief have not been served such that their consent is not required. *See* 28 U.S.C. § 1446(b)(2)(A) (requiring that only defendants properly joined *and* served must consent to removal (emphasis added)).

27. Since they are named only as "respondents in discovery," Abbott and AbbVie's consent to removal is not required. *See Jass*, 88 F.3d at 1485 n.3 (respondents in discovery are not a party to the litigation and therefore are not considered defendants for removal purposes).

## CONCLUSION

28. Based on the above, this action is removable to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

29. Pursuant to 28 U.S.C. § 1446(a), a copy of all "process, pleadings, and orders previously served on" PPG and Plaintiff's original complaint are attached to this Notice of Removal. *See DiNello v. U.S. Dep't of Ed.*, No. 06-2763, 2006 WL 3783010, at *1 n.1 (N.D. Ill. Dec. 21, 2006) (Hart, J.).

30. In accordance with 28 U.S.C. § 1446(d), PPG will promptly provide written notice of removal of the State Action to Plaintiffs and will promptly file a copy of this Notice of Removal with the Clerk of the Circuit Court of Cook County, Illinois.

31. PPG's Rule 7.1 Corporate Disclosure Statement and Local Rule 3.2 Notification as to Affiliates Statement will be filed promptly following this Notice of Removal.

32.     If any question arises as to the propriety of the removal of this action, PPG requests the opportunity to present a brief with supporting documentation, if applicable, and oral argument in support of its position that this case is removable.

33.     By filing this notice of removal, PPG does not waive and hereby expressly reserves the right to assert any defense or motion available in this action pursuant to state or federal law after removal to this Court, including, but not limited to, objections regarding jurisdiction, venue, sufficiency of process or service of process, and the service of discovery.

WHEREFORE, PPG respectfully removes this action from the Circuit Court of Cook County, Illinois, County Department, Law Division to the United States District Court for the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

Respectfully submitted,

**PPG INDUSTRIES, INC.**

By */s/ Vincenzo R. Chimera*
    Vincenzo R. Chimera #6320435
    Kenn Brotman #6236771
    **K&L GATES LLP** - #45515
    70 West Madison Street, Suite 3100
    Chicago, IL 60602
    Telephone: (312) 807-4200
    Email: vincenzo.chimera@klgates.com
    Email: kenn.brotman@klgates.com

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that on November 11, 2024, a true and correct copy of the foregoing document was served upon all known counsel of record via the Court's CM/ECF electronic filing system.

*/s/ Vincenzo R. Chimera*
Vincenzo R. Chimera

# EXHIBIT 1

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

Kimberly Mintz, as Personal
Representative of the Estate of Pearlie
Williams

*Plaintiff,*

v.

VANTAGE SPECIALTY CHEMICALS,
INC., BASF CORPORATION, PPG
INDUSTRIES, INC, MAC PENMAN, and
DAVID VAN LEWEN,

*Defendants.*
and

ABBOTT LABORATORIES and ABBVIE,
INC.,

*Respondents in Discovery.*

No. **2024L012458**

Judge: Calendar, D

**PLAINTIFF DEMANDS TRIAL BY JURY**

*In Re: Medline ETO Release*

Consolidated with 2023-L-000686 (previously
2019-L-009502) for pre-trial and discovery
purposes.

**F I L E D**

NOV 04 2024

IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

---

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Kimberly Mintz, as the Personal Representative of the Estate of Pearlie Williams[1],

brings this Complaint and Demand for Jury Trial against Vantage Specialty Chemicals, Inc.

("Vantage"), BASF Corporation ("BASF"), PPG Industries, Inc. ("PPG"), Mac Penman

("Penman"), and David Van Lewen ("Van Lewen"), (together "Defendants"), for causing Ms.

Williams to develop cancer. Plaintiff alleges that Defendants negligently polluted the air in Ms.

Williams's neighborhood with large amounts of ethylene oxide ("EtO"), a colorless and odorless

but highly carcinogenic gas. Plaintiff further alleges that these carcinogenic EtO emissions caused

---

[1] Ms. Kimberly Mintz is currently engaged in the probate process, after which, on information and belief, she will
be formally designated as the Personal Representative of Pearlie Williams's Estate.

Ms. Williams's lung cancer. Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters upon information and belief.

**INTRODUCTION**

**I.    Vantage, BASF, and PPG**

1.    Defendants are industrial users and polluters of ethylene oxide gas in Illinois. BASF, PPG, and Vantage are chemical producers that have operated a facility in Gurnee (the "Gurnee Facility".)

2.    While ethylene oxide ("EtO") has been classified as a human carcinogen since 1994, and its carcinogenic and mutagenic properties have been well documented in studies since at least the 1980s, Defendants disregarded ethylene oxide's harmful properties and continued to release it into the surrounding suburban communities—until recently entirely unbeknownst to area residents and workers.

3.    Self-reported emission estimates from Lake County facilities reflect high levels of ethylene oxide release. Ethylene oxide emissions from these facilities have reached as high as 13,000 pounds per year. While some EtO emissions are from controlled sources, the majority of these emission estimates are "fugitive emissions" that escape the facilities as they use EtO.

4.    Initial air monitoring tests commissioned by the Lake County Health Department, the Village of Gurnee, and the City of Waukegan demonstrated to the public the widespread nature of the ethylene oxide pollution taking place. The tests show the presence of toxic ethylene oxide gas as far as 4 miles from the Gurnee Facility, much further than previously suspected.

5.    As a result, individuals living and working near these EtO-emitting facilities face some of the highest long-term cancer risks in the United States. These individuals have been inhaling ethylene oxide on a routine basis for decades. Now they are suffering from a variety of

cancers, miscarriages, birth defects, and other life-altering health effects from their regular exposure to ethylene oxide.

## II.     Defendants Van Lewen and Penman

6.      Defendants Van Lewen and Penman are current and former employees and managers of the EtO emitting-facilities who were personally responsible for maintenance, monitoring, and safety at the facilities.

7.      Defendant Van Lewen served as the Ecology and Safety Manager for Defendant BASF at the Gurnee Facility. His responsibilities included personally managing EtO emissions and maintaining overall safety at the facility.

8.      Defendant Penman was Operations Manager for Defendant PPG at the Gurnee Facility. In his role, he personally coordinated and oversaw the operation of the facility, managing EtO emissions, implementing procedures, and maintaining employee safety.

9.      Each of these Defendants knew that EtO was carcinogenic and dangerous to human health, and that serious health consequences would result from failing to control EtO emissions from the facilities. As elaborated below, the severe health risks associated with EtO have been well known within the industry from at least the 1970s forward. The Defendants knew, or should have known, that emitting high volumes of EtO into the surrounding community was likely to cause exposed community members to develop cancer and other diseases. It was both probable and reasonably foreseeable that community members, including Pearlie Williams, would develop cancer as a result of these emissions.

10.     Despite their knowledge that EtO posed a danger to community members, the managers negligently failed to implement adequate emissions control measures, perform sufficient maintenance, or properly monitor emissions, resulting in excessive EtO emissions that caused Pearlie Williams's cancer diagnosis.

3

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over Defendants pursuant to 735 ILCS 5/2-209 because they conduct business transactions in Illinois, maintain facilities in Illinois, and/or have committed tortious acts in Illinois.

12.     Venue is proper in Cook County pursuant to 735 ILCS 5/2-101 because, among other reasons, at least one Defendant (Vantage) maintains offices in Cook County and is headquartered in Cook County. Each Defendant conducts business in Cook County.

## THE PARTIES

13.     Plaintiff Kimberly Mintz is a natural person and a citizen of the State of Georgia.

14.     Plaintiff's decedent, Pearlie Williams was 87 years old when she died of cancer. Kimberly Mintz is the Personal Representative of the Estate of Pearlie Williams.

15.     Defendant Vantage Specialty Chemicals, Inc. and its predecessors have operated and continue to operate a chemical production facility in Gurnee, Illinois since at least 2003 (the "Gurnee Facility"). Vantage Specialty Chemicals, Inc. is a privately-held company headquartered at 4650 South Racine Avenue in Chicago, Cook County, Illinois. Defendant is authorized to transact business in this county and is doing business in this county.

16.     Defendant BASF Corporation operated the chemical production facility in Gurnee, Illinois from 1997 to 2003. BASF is a publicly-held company headquartered at 100 Campus Drive, Florham Park in New Jersey. Defendant was authorized to transact business in this county and did business in this county.

17.     Defendant PPG Industries, Inc., or its predecessor owned and operated the Gurnee Facility from 1970 through about 1997. Mazer Chemicals, Inc. owned and operated the Gurnee Facility from 1970 through about the end of 1987. Mazer Chemicals, Inc. was acquired by and merged into PPG (directly or indirectly) in about December 1987, with PPG being the merger

4

survivor. PPG continued to own and operate the Gurnee Facility through about 1997, when the Gurnee Facility was acquired by BASF. Defendant PPG Industries, Inc., is a publicly-held company headquartered at One PPG Place in Pittsburgh, Pennsylvania.

18. Defendants Mac Penman and David L. Van Lewen are natural persons and citizens of the State of Illinois.

19. Abbott Laboratories is a publicly-held company headquartered at 100 Abbott Park Road, Abbott Park.

20. AbbVie Inc. is a publicly-held company headquartered at 1 N. Waukegan Road in North Chicago, Illinois.

## COMMON FACTUAL ALLEGATIONS

### I.     Brief Overview of the Ethylene Oxide Industry

21. Ethylene oxide is a flammable gas at room temperature that is produced in large volumes for industrial uses. There are two primary known industrial uses for ethylene oxide at Lake County facilities: medical equipment sterilization and chemical production.

22. Commercial medical equipment sterilizers use the ethylene oxide sterilization process on over 20 billion health care products every year in the United States. The EtO sterilization process begins by placing medical equipment in a gas chamber. After air is pumped out of the room, ethylene oxide is introduced and allowed to diffuse into the products for several hours. Once the medical equipment is sterilized, the ethylene oxide is pumped out of the chamber and the remaining EtO is allowed to slowly dissipate from the equipment.

23. Concerning chemical production, EtO undergoes a chemical reaction to create new chemical compounds. Ethylene glycol is one of the most common chemicals synthesized from ethylene oxide and is often used in a wide range of products such as polyester fibers (for use in

5

clothing, carpets, and upholstery), industrial coolants, antifreeze, and personal care products such as cosmetics, shampoos, body washes, and other skincare products.

24.    Defendants use and/or have used ethylene oxide in their industrial processes. BASF, PPG, Vantage, and their predecessors have used, and Vantage continues to use, EtO in chemical production at its Gurnee facility since at least 1970.

25.    Respondents Abbott Laboratories and AbbVie, Inc. have owned or operated facilities in Lake County, Illinois that used and emitted EtO from at least 1975 to at least 2004.

26.    Throughout the industrial processes described above, EtO is emitted in both "controlled" emissions through known points of exit from the facilities (i.e., smokestacks or vents), as well as through "fugitive" emissions: unregulated escapes of EtO through leaky seals, old or malfunctioning equipment, operator error, or other untracked sources.

27.    Through their processes, these plants emitted (and Vantage continues to emit) EtO into the air, allowing it to disperse and be carried by wind throughout the area surrounding the facilities. Indeed, Lake County recently conducted EtO air monitoring tests, discussed below, demonstrating that EtO emissions have traveled as far as 4 miles from the Gurnee Facility.

28.    As such, local residents and workers in the Lake County area have unknowingly been exposed to carcinogenic ethylene oxide for decades. All Defendants knew, or should have known, EtO to be dangerous, toxic, carcinogenic, mutagenic, and the cause of various illnesses.

II.    **Health Effects of Ethylene Oxide Exposure**

29.    Ethylene oxide is dangerous, toxic, carcinogenic, and mutagenic. EtO is highly reactive, readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body. Its deleterious properties have been widely known in the industries that use it for decades.

6

30.     In a 1977 article, the National Institute of Occupational Safety and Health ("NIOSH") concluded that occupational exposure to ethylene oxide may increase the frequency of genetic mutations in humans. The NIOSH report also raised a concern about potential carcinogenicity of ethylene oxide.

31.     In 1981, the NIOSH released a subsequent report which recommended that EtO be regarded in the workplace as a potential occupational carcinogen. The NIOSH based its recommendation on new evidence of EtO's carcinogenic, mutagenic, and reproductive hazards including studies demonstrating that EtO induced cancer in experimental animals. Specifically, the studies showed an increase in instances of leukemia in line with the increase of EtO concentrations, in addition to other adverse effects on reproductive health. An epidemiological investigation of Swedish workers exposed to EtO also revealed an increased number of leukemia and other cancers.

32.     The 1981 NIOSH report was widely disseminated in the form of a bulletin available to users and emitters of ethylene oxide and the petrochemical industry at large. Indeed, NIOSH requested that producers, distributors, and users of EtO further disseminate the bulletin and inform others of the chemical's dangers: "[o]n the basis of this information, NIOSH requests that producers, distributors, and users of ethylene oxide, and of substances and materials containing ethylene oxide, give this information to their workers and customers, and that professional and trade associations and unions inform their members."

33.     In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

34.     In the early 1990s, the NIOSH published the largest and most informative epidemiological study of ethylene oxide. The study analyzed over 18,000 employees working with EtO at 14 different industrial facilities sterilizing medical equipment and food spices. The study

7

found sufficient evidence to support a causal link between exposure to ethylene oxide and increased mortality from lymphatic and hematopoietic cancers. Follow-up studies have additionally demonstrated an association between EtO exposure and breast cancer.

35. As a result of these findings, the World Health Organization ("WHO") listed EtO as a Group 1 human carcinogen in 1994, the agency's highest risk classification, finding ethylene oxide to be carcinogenic to humans. In 2000, the U.S. Department of Health and Human Services revised its classification for EtO to "known to be a human carcinogen." In 2016, the U.S. Environmental Protection Agency's Integrated Risk Information System reclassified EtO as carcinogenic to humans and increased the cancer potency of EtO by 30 times. Critically, these classifications are not limited to the workplace: EtO is carcinogenic and harmful to those who ingest it even if they don't work with it on a regular basis. The draft December 2020 Toxicological Profile for Ethylene Oxide submitted for public comment by the Agency for Toxic Substances and Disease Registry, for example, recognizes that those living near facilities that use EtO may face elevated concentrations because of emissions or accidental releases. Indeed, as described below, it is precisely because EtO is carcinogenic regardless of circumstance that it is recognized as a toxic air pollutant whose emissions must be tracked and its release into the atmosphere (and consequential exposure to nearby properties) limited.

36. Exposure to ethylene oxide has been widely studied and its negative health effects are well documented. Presently, there is evidence linking ethylene oxide exposure to increased risk of lymphohematopoietic cancer such as non-Hodgkin's lymphoma, myeloma, and lymphocytic leukemia; breast cancer; tumors in the lungs, uterus, and the brain; and reproductive and developmental impairments including increased rate of miscarriages and infertility.

37. Most recently, the Illinois Department of Public Health ("IDPH") conducted an assessment of cancer rates in the population surrounding the Sterigenics facility in Willowbrook,

8

Illinois that has been using and emitting EtO in its industrial sterilization process since 1984. The findings reaffirmed the decades of studies on EtO exposure. The IDPH found elevated cases of:

- Hodgkin's lymphoma;
- Pediatric lymphoma;
- Breast cancer;
- Prostate cancer;
- Pancreatic cancer;
- Ovarian cancer; and
- Bladder cancer.

38. Worst of all, ethylene oxide exposure affects the most vulnerable members of the population. The U.S. Environmental Protection Agency ("U.S. EPA") states that "for a single year of exposure to ethylene oxide, the cancer risk is greater for children than for adults. That is because ethylene oxide can damage DNA."

**III. Defendants Knew For Decades That EtO Emissions Were Harmful**

39. By the early 1970s (at the latest), ethylene oxide's negative health effects were widely disseminated to industrial users and emitters of the chemical. This means that, by the time each Defendant operated its facility— starting with PPG in at least 1970—it knew or should have known that ethylene oxide is and was always dangerous to human health and that its emissions posed (and continue to pose) a serious risk to area residents.

40. In 1981, the National Institute for Occupational Safety and Health ("NIOSH") published a "current intelligence bulletin" recommending that EtO "be regarded in the workplace as a potential occupational carcinogen, and that appropriate controls be used to reduce worker exposure. That bulletin was widely circulated amongst all industrial users of EtO, with one

prominent EtO sterilizer, Sterigenics, circulating an internal memorandum describing the bulletin as "another nail in the coffin" of EtO sterilization.

41.     In October 1985, the U.S. EPA issued a Notice of Intent to list EtO as a hazardous air pollutant. The Notice expressed concern over the "adverse health effects associated with ethylene oxide exposure" and cited the various studies on EtO's carcinogenic health effects. In this Notice, the U.S. EPA also stated that it performed a dispersion model to estimate the concentration levels which the public may be exposed near EtO emission sources and conducted a preliminary risk assessment. The U.S. EPA's preliminary risk assessment found that there was a risk of an additional 47 cases of cancer per year in areas surrounding EtO sterilizers and fumigators and concluded that "ethylene oxide can exist in the ambient air for at least several hours, a sufficient length of time for a significant human exposure to occur."

42.     In July 1986, when considering adding "ethylene oxide (EO) to the list of hazardous air pollutants" the U.S. EPA issued a letter to ethylene oxide users requesting "information about E[t]O sterilization processes, E[t]O emission levels from sterilizers, and emission controls on E[t]O sterilizers at each of your facilities that uses E[t]O for sterilization or fumigation." This request came in light of the NIOSH study showing evidence of EtO's carcinogenic, mutagenic, and reproductive hazards and the U.S. EPA's concern with "significant quantities of EO [being emitted] to the atmosphere" and, consequently, affecting individuals living and working near ethylene oxide facilities. The U.S. EPA sent the July 1986 letter to various EtO users and emitters. Ultimately, ethylene oxide was included on the original list of hazardous air pollutants identified in the 1990 Amendment to the Clean Air Act.

43.     By (and well before) 1990 then, ethylene oxide users and emitters were well aware of the dangers of the chemical and legal consequences of emissions. Indeed, in 1990 California Attorney General Van de Kamp brought a lawsuit against four emitters of ethylene oxide alleging

10

that the EtO emitters had exposed an estimated 3 million people living near emissions sites to the potent carcinogen.

44.     The Defendants in this action, however, continued to emit large quantities of ethylene oxide (as discussed below) notwithstanding these known dangers.

45.     In 1996, the U.S. EPA issued its first model of EtO exposure concentrations for areas surrounding emitters. The 1996 model revealed that Lake County, Illinois residents had significantly greater EtO concentration exposure (0.0085 µg/m³) than the national average (0.00295 µg/m³), or over 2.8 times the average nationwide concentration. The 95th percentile of modeled ethylene oxide exposure in Lake County (0.02176 µg/m³) was also *double* that of the national 95th percentile (0.01051µg/m³) of human exposure concentration.

46.     The U.S. EPA repeated its exposure concentration modeling by using reported emissions from 1999. The 1999 air modeling revealed that Lake County residents are at an increased risk of cancer from ethylene oxide and had a risk greater than 1.5 times the national cancer risk from ethylene oxide exposure.

47.     Thus, the potential dangers EtO emissions posed to nearby residents was known, or should have been known, to the Defendants by the time they operated their facilities, and years in advance of Pearlie Williams's diagnosis.

**IV.     Lake County Facilities Emit Harmful Ethylene Oxide**

     **a.     The U.S. EPA Estimates High Risks of Cancer in Lake County**

48.     On August 22, 2018, the U.S. EPA released the 2014 National Air Toxics Assessment ("NATA"). The NATA is a screening tool that estimates cancer risks based on emission data in 76,727 census tracts across the United States.

49.     The 2014 NATA revealed 109 census tracts in the United States with cancer risk scores greater than what the U.S. EPA considers "acceptable" limits: 100 cases for every 1 million

people exposed to toxic air pollution during their lifetime. Of the 109 census tracts, the 2014 NATA identified four tracts in northern Illinois as having potential cancer risks of 100 in 1 million or greater from exposure to air toxics:

- Tract 17097862605/8626.05 (1.1 mi² near Waukegan, Park City): **157 per million**;

- Tract 17097862800/8628.00 (1.2 mi² near Waukegan, North Chicago): **131 per million**;

- Tract 17097861504/8615.04 (2.8 mi² near Gurnee, Park City): **123 per million**; and

- Tract 17097862604/8626.04 (1 mi² near Waukegan, Park City): **100 per million**.

50.     The U.S. EPA released a statement that it believes that "largest sources of ethylene oxide emissions in Lake County" include "Vantage, a chemical production facility in Gurnee."

51.     The U.S. EPA estimates the lifetime risk of developing cancer due to air toxics in one of these four Lake County tracts near the Gurnee Facility to be up to five times higher than average the average national cancer risk across the U.S. population. Fewer than one percent of the census tracts in the United States have an estimated cancer risk due to air toxics of greater than or equal to 100 in one million.

**b.     The U.S. EPA's Cancer Risk Assessments are Understated**

52.     While the 2014 NATA reveals shockingly high risks of cancer across a large area near the Gurnee Facility, these risks are understated.

53.     The U.S. EPA warns that the NATA is *only* a screening tool that local municipalities can use in order to further investigate the emission sources and potential public health risks. It notes several NATA shortcomings such as the lack of direct measurements of pollutants and data gaps.

54.     The lifetime risk of developing cancer in the aforementioned census tracts is likely significantly higher than what the U.S. EPA estimated in the 2014 NATA. That is because Vantage's 2014 EtO emissions were actually *omitted* from the 2014 NATA. According to the U.S.

12

EPA, this was due to a clerical "error" in the National Emissions Inventory which caused Vantage's 2014 EtO emissions to be calculated as zero for purposes of the 2014 NATA.[2] That is, the finding that cancer risk levels were up to five times the national average were based on the assumption that Vantage did not emit a single pound of EtO in 2014. Adding in the thousands of pounds that Vantage actually emitted would only result in ever higher cancer risk levels for the areas surrounding the plant. In short, without the Vantage emissions in its calculations, the cancer risks identified in the 2014 NATA for people living and working in the area were and continue to be dramatically underestimated.

55.     Most importantly, the 2014 NATA is only a model created on an assumed exposure to a facility's reported emissions from a single year: 2014. But the emissions from the Gurnee Facility have historically been much higher than its reported emissions in 2014.

56.     The U.S. EPA maintains a Toxics Release Inventory ("TRI") which includes annual self-reported emissions data from industrial facilities using EtO and other toxic chemicals which pose a threat to human health and the environment.

57.     A review of TRI data from the U.S. EPA shows EtO emissions from the Gurnee Facility over the past three plus decades, with a prominent increase of emissions beginning in 2010. *See* Figure 1.



(**Figure 1.**)

58.     While Vantage ultimately reported 2,723 pounds of EtO emissions in 2014, that figure is overshadowed by its nearly 20,000 pounds emissions of EtO during a two-year period in 2010 and 2011. Similarly, Vantage reports emitting EtO in smaller, albeit significant quantities throughout the years:

- 2010: 9,649 pounds
- 2011: 9,709 pounds
- 2012: 3,425 pounds
- 2013: 2,832 pounds

- 2014: 2,723 pounds
- 2015: 1,277 pounds
- 2016: 1,127 pounds
- 2017: 1,547 pounds

59.     It is important to note that majority of Vantage's reported total emissions, as shown above, are the result of estimated "fugitive" emissions. To illustrate, Vantage's fugitive emissions constituted more than 80% of its total emissions in 2010 and 2011. In 2010, Vantage reported 9,649 pounds of total EtO emissions with 8,073 pounds of fugitive emissions and in 2011 Vantage reported 9,709 pounds of total EtO emissions with 7,984 pounds of fugitive emissions. Vantage's fugitive EtO emissions constitute a significant portion of its total emissions:

- 2010: 8,073 pounds
- 2011: 7,984 pounds
- 2012: 2,704 pounds
- 2013: 2,110 pounds

- 2014: 2,003 pounds
- 2015: 551 pounds
- 2016: 414 pounds
- 2017: 810 pounds

60.     Because of the elusive nature of these fugitive emissions, they are difficult to calculate, and are likely an underestimation. In fact, Vantage entered into a compliance agreement with the Illinois EPA regarding allegations that Vantage failed to test and maintain EtO-filtration equipment—which may have failed to achieve the required reduction in overall uncontrolled EtO emissions—in 2016.

14

61.     And although Vantage reported reductions in emissions after 2012, the facility's self-reported regulatory data is difficult to independently verify. For example, Vantage reported to another office at the U.S. EPA that during 2014 it released 6,412 pounds of EtO—**not 2,723 pounds as has been recently reported to the U.S. EPA**.

62.     Unfortunately, none of these emissions were used in calculating the cancer risks in the 2014 NATA, as mentioned above.

63.     While all Defendants have been knowingly releasing EtO for decades, people living and working in the surrounding community were unaware that the Defendants routinely exposed them to a dangerous, toxic, carcinogenic, and mutagenic gas.

**c.     Lake County Begins Air Monitoring**

64.     On August 21, 2018, the U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR") released a report of health risks related to the chemical release of EtO by Sterigenics, a commercial sterilizer 40 miles southwest in Willowbrook, Illinois. The ATSDR concluded that an elevated cancer risk existed for residents and off-site workers in the Willowbrook community surrounding the Sterigenics facility due to EtO.

65.     In the following months, Lake County officials, health departments, state and national elected representatives, and concerned residents repeatedly pleaded with the U.S. EPA and Illinois Environmental Protection Agency ("IEPA") to conduct ambient air monitoring surrounding the Gurnee Facility. Despite these requests, the U.S. EPA and IEPA refused to conduct ambient air monitoring anywhere in Lake County, much less near the Gurnee Facility.

66.     Finally, on May 20, 2019, local community officials approved an intergovernmental agreement between the Village of Gurnee, City of Waukegan, and Lake County to conduct air monitoring.

15

67.     The air monitoring began on June 3, 2019 by placing cannisters at four sites near the Gurnee Facility and two remote locations in Lake County. The Lake County Health Department released partial test results on June 21, 2019 that revealed the presence of EtO in almost every sample. The test results also showed the presence of EtO as far as 4 miles from the Gurnee Facility. The air monitoring cannisters in Lake County registered elevated levels of EtO with the highest twenty-four hour reading at ten micrograms of ethylene oxide per cubic meter of air (10 ug/m$^3$).

68.     For reference, the U.S. EPA associates a concentration of ethylene oxide of 0.02 ug/m$^3$ with a 100-in-a-million cancer risk for a lifetime of exposure. The highest recorded EtO concentration surrounding the Gurnee Facility corresponds with a cancer risk as high as 500 times the EPA's 100-in-a-million cancer risk.

69.     On November 26, 2019 the Lake County Health Department received the first set of air monitoring test results from the second phase of air testing that took place between October 26, 2019 and November 2, 2019.

70.     Air test results confirm the June 2019 findings. That is, ethylene oxide has been detected in high concentration in communities around the Gurnee Facility, and in remote locations away from the facility.

71.     Lake County's final phase of air monitoring started in April 2020. The air monitoring canisters registered EtO levels over 53 times the EPA's 100-in-a-million cancer risk in remote locations and as high as 5.49 µg/m$^3$ near the Gurnee Facility—representing EtO levels over 274 times the EPA's 100-in-a-million cancer risk.

72.     The full extent of EtO emissions throughout Lake County was unknown to those living and working in the area until Lake County released the air monitoring test results. Indeed, the local air monitoring tests revealed a more accurate picture of EtO concentrations and the

16

distance EtO has traveled than the U.S. EPA's NATA report. And the air monitoring tests revealed areas in Lake County with high EtO concentrations that were previously not indicated by the 2014 NATA report.

73.     Even still, the full health impact on those who live and work near the Gurnee Facility is still not entirely known. The Lake County Health Department has requested that the Illinois Department of Public Health conduct a cancer incidence assessment in Lake County.

### FACTS SPECIFIC TO PEARLIE WILLIAMS

74.     Plaintiff Kimberly Mintz's decedent, Pearlie Williams had been a resident of the Lake County area since around 1977. From around 1977 to 2022, she lived approximately 4.5 miles from the Gurnee Facility and 1.9 miles from the North Chicago Facility. From around 1969 to 1999, she worked approximately 4.6 miles from the Gurnee Facility and 0.07 miles from the North Chicago Facility.

75.     Pearlie Williams consistently inhaled contaminated air in and around her home, her work, and in the Lake County area.

76.     Because of her inhalation of EtO from the Defendants' facilities, Pearlie Williams was diagnosed with lung cancer in or around 2020, and died in November 2022.

77.     Plaintiff, having exercised reasonable diligence, first learned that Decedent's injury was wrongfully caused on a date less than two years prior to the filing of this complaint.

### COUNT I
#### Negligence – Wrongful Death, 740 ILCS 180/1 *et seq.*
#### (On Behalf of Plaintiff and Against Defendants)

78.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

79.     At all times relevant, Defendants owed a duty to exercise reasonable care in the operation of their facilities, including in their emission of EtO, to prevent harm to neighboring Pearlie Williams. It was reasonably foreseeable that neighboring persons would be exposed to

17

elevated levels of Defendants' EtO emissions, and would face the health risks associated with EtO exposure.

80. At all relevant times, Defendant Van Lewen, as the Ecology and Safety Manager of Defendant BASF at the Gurnee Facility, was responsible for the management of EtO emissions and for ensuring overall safety at the facility. In that capacity, Van Lewen knew or should have known that ethylene oxide posed a danger to the surrounding community and owed a duty to exercise reasonable care to the people living and working in that community, including Pearlie Williams.

81. At all relevant times, Defendant Penman, as the Operations Manager of Defendant PPG at the Gurnee Facility, was responsible for coordinating and overseeing the operation of the facility, directing personnel at the facility, managing EtO emissions, and implementing procedures to ensure overall safety at the facility. In that capacity, Penman knew or should have known that ethylene oxide posed a danger to the surrounding community and owed a duty to exercise reasonable care to the people living and working in that community, including Pearlie Williams.

82. Notwithstanding their duty, Defendants breached their duty in one or more of the following ways:

    a.    Emitting dangerous volumes of EtO into the air;

    b.    Disregarding safe methods to adequately control EtO emissions;

    c.    Failing to warn or advise those who live or work in the community, that they were being exposed to EtO;

    d.    Failing to adequately record test results of higher levels of EtO;

    e.    Ignoring test results of high levels of EtO;

    f.    Underreporting EtO levels; and

    g.    Subjecting those who live and work near their facilities to an elevated cancer risk.

18

83. As a proximate result of one of the aforesaid negligent acts or omissions, Pearlie Williams suffered injuries of a personal and pecuniary nature, including her death.

84. As a direct and proximate result of one or more of the aforesaid negligent acts or omissions, Plaintiff Kimberly Mintz, as daughter of the decedent, has suffered and will continue to suffer the loss of Pearlie Williams's society, love, affection, and guidance, amongst other harms.

WHEREFORE Plaintiff Kimberly Mintz demands judgment against Defendants in an amount in excess of the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.

### COUNT II
### Negligence – Survivorship, 755 ILCS 5/27-6
### (On Behalf of Plaintiff and Against Defendants)

85. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

86. At all times relevant, Defendants owed a duty to exercise reasonable care in the operation of their facilities, including in their emission of EtO, to prevent harm to neighboring Pearlie Williams. It was reasonably foreseeable that neighboring persons would be exposed to elevated levels of Defendants' EtO emissions, and would face the health risks associated with EtO exposure.

87. At all relevant times, Defendant Van Lewen, as the Ecology and Safety Manager of Defendant BASF at the Gurnee Facility, was responsible for the management of EtO emissions and for ensuring overall safety at the facility. In that capacity, Van Lewen knew or should have known that ethylene oxide posed a danger to the surrounding community and owed a duty to exercise reasonable care to the people living and working in that community, including Pearlie Williams.

19

88.     At all relevant times, Defendant Penman, as the Operations Manager of Defendant PPG at the Gurnee Facility, was responsible for coordinating and overseeing the operation of the facility, directing personnel at the facility, managing EtO emissions, and implementing procedures to ensure overall safety at the facility. In that capacity, Penman knew or should have known that ethylene oxide posed a danger to the surrounding community and owed a duty to exercise reasonable care to the people living and working in that community, including Pearlie Williams.

89.     Notwithstanding their duty, Defendants breached their duty in one or more of the following ways:

      h.     Emitting dangerous volumes of EtO into the air;

      i.     Disregarding safe methods to adequately control EtO emissions;

      j.     Failing to warn or advise those who live or work in the community, that they were being exposed to EtO;

      k.     Failing to adequately record test results of higher levels of EtO;

      l.     Ignoring test results of high levels of EtO;

      m.     Underreporting EtO levels; and

      n.     Subjecting those who live and work near their facilities to an elevated cancer risk.

90.     As a proximate result of one of the aforesaid negligent acts or omissions, Pearlie Williams suffered injuries of a personal and pecuniary nature.

WHEREFORE Plaintiff Kimberly Mintz demands judgment against Defendants in an amount in excess of the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.

**COUNT III**
**Willful and Wanton Conduct – Wrongful Death, 740 ILCS 180/1 *et seq.***
**(On Behalf of Plaintiff and Against Defendants)**

20

91. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

92. At all times relevant, Defendants owed a duty to refrain from willful and wanton conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Pearlie Williams and those living and working in the area surrounding their facilities.

93. At all relevant times, Defendant Van Lewen, as the Ecology and Safety Manager of Defendant BASF at the Gurnee Facility, was responsible for the management of EtO emissions and for ensuring overall safety at the facility. In that capacity, Van Lewen knew or should have known that ethylene oxide posed a danger to the surrounding community and owed a duty to refrain from willful and wanton conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Pearlie Williams and those living and working in the area surrounding the Gurnee Facility.

94. At all relevant times, Defendant Penman, as the Operations Manager of Defendant PPG at the Gurnee Facility, was responsible for coordinating and overseeing the operation of the facility, directing personnel at the facility, managing EtO emissions, and implementing procedures to ensure overall safety at the facility. In that capacity, Penman knew or should have known that ethylene oxide posed a danger to the surrounding community and owed a duty to refrain from willful and wanton conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Pearlie Williams and those living and working in the area surrounding the Gurnee Facility.

95. Notwithstanding their duties, Defendants breached their duties in one or more of the following ways:

    a. Emitting dangerous volumes of EtO into the air;

    b. Disregarding safe methods to adequately control EtO emissions;

21

  c.  Failing to warn or advise those who live or work in the community, that they were being exposed to EtO;

  d.  Failing to adequately record test results of higher levels of EtO;

  e.  Ignoring test results of high levels of EtO;

  f.  Underreporting EtO levels; and

  g.  Subjecting those who live and work near their facilities to an elevated cancer risk.

96.  As a proximate result of one of the aforesaid willful and wanton acts or omissions, Pearlie Williams suffered injuries of a personal and pecuniary nature, including her death.

97.  As a direct and proximate result of one or more of the aforesaid willful and wanton acts or omissions, Plaintiff Kimberly Mintz, as daughter of the decedent, has suffered and will continue to suffer the loss of Pearlie Williams's society, love, affection, and guidance, amongst other harms.

WHEREFORE Plaintiff Kimberly Mintz demands judgment against Defendants in an amount in excess of the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.

### COUNT IV
**Willful and Wanton Conduct – Survivorship, 755 ILCS 5/27-6**
**(On Behalf of Plaintiff and Against Defendants)**

98.  Plaintiff incorporates the foregoing allegations as if fully set forth herein.

99.  At all times relevant, Defendants owed a duty to refrain from willful and wanton conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Pearlie Williams and those living and working in the area surrounding their facilities.

22

100.    At all relevant times, Defendant Van Lewen, as the Ecology and Safety Manager of Defendant BASF at the Gurnee Facility, was responsible for the management of EtO emissions and for ensuring overall safety at the facility. In that capacity, Van Lewen knew or should have known that ethylene oxide posed a danger to the surrounding community and owed a duty to refrain from willful and wanton conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Pearlie Williams and those living and working in the area surrounding the Gurnee Facility.

101.    At all relevant times, Defendant Penman, as the Operations Manager of Defendant PPG at the Gurnee Facility, was responsible for coordinating and overseeing the operation of the facility, directing personnel at the facility, managing EtO emissions, and implementing procedures to ensure overall safety at the facility. In that capacity, Penman knew or should have known that ethylene oxide posed a danger to the surrounding community and owed a duty to refrain from willful and wanton conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Pearlie Williams and those living and working in the area surrounding the Gurnee Facility.

102.    Notwithstanding their duties, Defendants breached their duties in one or more of the following ways:

      h.    Emitting dangerous volumes of EtO into the air;

      i.    Disregarding safe methods to adequately control EtO emissions;

      j.    Failing to warn or advise those who live or work in the community, that they were being exposed to EtO;

      k.    Failing to adequately record test results of higher levels of EtO;

      l.    Ignoring test results of high levels of EtO;

      m.    Underreporting EtO levels; and

23

      n.     Subjecting those who live and work near their facilities to an elevated cancer risk.

103.    As a proximate result of one of the aforesaid willful and wanton acts or omissions, Pearlie Williams suffered injuries of a personal and pecuniary nature.

WHEREFORE Plaintiff Kimberly Mintz demands judgment against Defendants in an amount in excess of the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT V
### Public Nuisance – Wrongful Death, 740 ILCS 180/1 *et seq.*
### (On Behalf of Plaintiff and Against Defendants)

104.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

105.    At all relevant times, Defendants have known EtO to be hazardous and harmful to humans.

106.    The general public has a common right to breathe clean air without dangerous levels of carcinogens such as EtO. The Illinois Constitution guarantees these rights to its citizens. Article XI of the Illinois Constitution of 1970, Environment, Section 1, Public Policy - Legislative Responsibility, provides that:

> The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy.

Article XI of the Illinois Constitution of 1970, Environment, Section 2, Rights of Individuals, provides that:

> Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law.

24

107.    Defendants' use and emission of EtO from their facilities substantially and unreasonably infringes upon and/or transgresses this public right.

108.    Defendants knew and should have known that the EtO they emitted would have a toxic, poisonous, and deleterious effect upon the health, safety, and well-being of persons inhaling it, including people living and working in the community.

109.    Defendants' operation, maintenance, and use of their facilities caused those who live and work in the area surrounding their facilities to breathe air containing high levels of EtO on a routine basis, causing a substantially elevated risk of cancer.

110.    As a proximate result, Pearlie Williams's and the general public's common right to breathe clean air without dangerous levels of carcinogens such as EtO was eliminated and/or severely diminished.

111.    As a proximate result, EtO invaded and caused to be contaminated the areas immediately surrounding and on Pearlie Williams's residence and work.

112.    As a proximate result, Pearlie Williams was exposed to and inhaled significant quantities of EtO.

113.    As a proximate result, Pearlie Williams sustained severe and permanent damage to her health due to the emission of EtO.

114.    As a proximate result, Pearlie Williams suffered injuries of a personal and pecuniary nature, including her death.

115.    As a proximate result of Pearlie Williams's death, Plaintiff Kimberly Mintz, as daughter of the decedent, has suffered and will continue to suffer the loss of Pearlie Williams's society, love, affection, and guidance, amongst other harms.

25

WHEREFORE Plaintiff Kimberly Mintz demands judgment against Defendants in an amount in excess of the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT VI
### Public Nuisance – Survivorship, 755 ILCS 5/27-6
### (On Behalf of Plaintiff and Against Defendants)

116.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

117.     At all relevant times, Defendants have known EtO to be hazardous and harmful to humans.

118.     The general public has a common right to breathe clean air without dangerous levels of carcinogens such as EtO. The Illinois Constitution guarantees these rights to its citizens. Article XI of the Illinois Constitution of 1970, Environment, Section 1, Public Policy - Legislative Responsibility, provides that:

> The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy.

Article XI of the Illinois Constitution of 1970, Environment, Section 2, Rights of Individuals, provides that:

> Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law.

119.     Defendants' use and emission of EtO from their facilities substantially and unreasonably infringes upon and/or transgresses this public right.

120.     Defendants knew and should have known that the EtO they emitted would have a toxic, poisonous, and deleterious effect upon the health, safety, and well-being of persons inhaling it, including people living and working in the community.

26

121.    Defendants' operation, maintenance, and use of their facilities caused those who live and work in the area surrounding their facilities to breathe air containing high levels of EtO on a routine basis, causing a substantially elevated risk of cancer.

122.    As a proximate result, Pearlie Williams's and the general public's common right to breathe clean air without dangerous levels of carcinogens such as EtO was eliminated and/or severely diminished.

123.    As a proximate result, EtO invaded and caused to be contaminated the areas immediately surrounding and on Pearlie Williams's residence and work.

124.    As a proximate result, Pearlie Williams was exposed to and inhaled significant quantities of EtO.

125.    As a proximate result, Pearlie Williams sustained severe and permanent damage to her health due to the emission of EtO.

126.    As a proximate result, Pearlie Williams suffered injuries of a personal and pecuniary nature.

WHEREFORE Plaintiff Kimberly Mintz demands judgment against Defendants in an amount in excess of the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT VII
### Respondents in Discovery
### (On Behalf of Plaintiff and Against Abbott Laboratories and AbbVie, Inc.)

127.    Pursuant to 735 ILCS 5/2-402, Plaintiff designates Abbott Laboratories and AbbVie, Inc. as Respondents in Discovery.

128.    Plaintiff believes each has information essential to the determination of who should be properly named as party-defendants in this action and states as follows:

27

129.     Plaintiff realleges and incorporates paragraphs 1-126 above as though fully set forth herein.

130.     Abbott Laboratories has owned or operated facilities in Lake County, Illinois that used and emitted EtO.

131.     AbbVie, Inc. has owned or operated facilities in Lake County, Illinois that used and emitted EtO.

WHEREFORE Plaintiff Kimberly Mintz names Abbott Laboratories and AbbVie, Inc. as Respondents in Discovery.

Respectfully submitted,

**KIMBERLY MINTZ, as Personal
Representative of the estate of PEARLIE
WILLIAMS**

Date: November 1, 2024

By: /s/ Brandt Silver-Korn
One of Plaintiff's Attorneys

Jay Edelson
jedelson@edelson.com
Benjamin H. Richman
brichman@edelson.com
Amy Hausmann
abhausmann@edelson.com
Schuyler Daum*
sdaum@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
312.589.6370
Firm ID: 62075

Todd Logan*
tlogan@edelson.com
Brandt Silver-Korn
bsilverkorn@edelson.com

28

Lauren Blazing*
lblazing@edelson.com
EDELSON PC
150 California St, 18th Floor,
San Francisco, CA 94111
415.212.9300

*Admitted Pro Hac Vice into consolidated
lead action

29